DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**KATINA PAESE,**
Petitioner,

v.

**STATE OF FLORIDA,**
Respondent.

No. 4D2023-1103

[February 28, 2024]

Petition for Writ of Prohibition to the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Edward H. Merrigan, Jr., Judge; L.T. Case No. 20-011120CF10A.

Kenneth David Padowitz and Joshua Padowitz of Kenneth Padowitz, P.A., Fort Lauderdale, for Petitioner.

Ashley Moody, Attorney General, Tallahassee, and Lindsay A. Warner, Senior Assistant Attorney General, West Palm Beach, for Respondent.

ARTAU, J.

This case presents us with the question of whether a high-rise condominium dweller may, consistent with Florida's Stand Your Ground ("SYG") law, use non-deadly force to prevent or terminate the tortious interference with her personal property.

The State charged Katina Paese ("Paese") with felony battery on a code inspector.[1] Prior to trial, Paese moved to dismiss the charge on grounds that the circumstances of the incident presented a prima facie case of a justifiable use of non-deadly force pursuant to the SYG law. In support of her motion, Paese argued that the SYG law gave her the statutory right to use non-deadly force against the code inspector and three other men involved in the incident because they "were wrongfully interfering with her personal property [by] physically and visually intruding into her private

---

[1] *See* § 784.03(1), Fla. Stat. (2020) (defining misdemeanor battery); § 784.083(3), Fla. Stat. (2020) (reclassifying misdemeanor battery on a code inspector as "a felony of the third degree").

condominium unit." She also argued that the State could not overcome "her prima facie claim of self-defense immunity from criminal prosecution" pursuant to section 776.032(4), Florida Statutes (2020), which places the "burden of proof by clear and convincing evidence" on the State.

Likewise, Paese argues in the petition she filed here that this case "stands at the intersection" of our SYG jurisprudence and her right to privacy. She specifically contends, as she did in the trial court, that the code inspector's unauthorized "visual search" of the "interior spaces" of her unit justified her use of non-deadly force to prevent or terminate the "taking of photographs" of "the interior of her home." She further argues that the State failed to prove by clear and convincing evidence that the non-deadly force she employed to terminate the encounter was objectively unreasonable.

We agree with Paese's arguments. We therefore conclude that Paese is entitled to immunity from prosecution because her use of non-deadly force to prevent or terminate the tortious interference with her personal property was consistent with the level of authorized force permitted by the SYG law.

### *Background*

At the time of the incident at issue, Paese was a resident of a high-rise condominium complex. One of the condominium's elevators opens into Paese's private unit with a key fob that provides her with exclusive access. The evidence presented at the immunity hearing established that the incident at the heart of this case began when she threw a roll of duct tape into the interior of the elevator after four men used a "master" key fob to override her exclusive access by stopping on her floor and opening the elevator door that separates the elevator's interior from Paese's unit. Paese threw the roll of tape from a place comfortably within the interior of her unit and in the direction of the four men who were standing in the open elevator as the elevator rested at the private landing for her unit.

When Paese first observed the four men in the open elevator, one of them had extended his arm into an area described as a "foyer" to hold the elevator door open. That individual was the condominium's property manager whom Paese knew. Paese did not know the other three men.

Thereafter, Paese saw one of the four men raise his cell phone to begin taking photographs of the interior of her unit. That man was the code inspector alleged to be Paese's victim.

It is undisputed that Paese's alleged victim was not in a uniform

2

signifying his status as a code inspector. It is also undisputed that the alleged victim never showed Paese his code inspector's badge at any point during the incident, nor did he verbally identify himself to her as being a code inspector.

Paese testified that she was "shocked" when she saw the four men, none of whom she was expecting at that time, in the open elevator. In fact, immediately prior to their arrival, Paese had expressly told a building security officer, who was calling on the property manager's behalf to request Paese's consent for access to her unit, that it was not a good time for the property manager to bring anyone up to her unit. In other words, Paese did not consent and had instead notified the men not to come to her unit before they suddenly appeared in the open elevator at the threshold of her unit taking pictures of the interior of her home despite the undisputed fact that she never gave permission for any of the men to open the elevator door at the private landing that provides exclusive access to her unit.

Paese explained her reaction upon seeing the four men as follows:

> Well, I was very upset, because I clearly told them that they were not allowed to come up to my unit, and they're not supposed to, and [the property manager] clearly overrode the security to come up and used a master fob, to override the security to come up to my unit. . . . That's the only way you can get up there. . . . So I was very mad, I was very upset with him, and I said how dare you come up here without my permission. . . . He overrode the security to come up to my unit without my permission. I never gave him permission to come up and that is a rule in our building. You do not come up without a unit owner's permission.
>
> . . . .
>
> I'm yelling at them to leave. I said leave, get out of here, get out of here, how dare you come up here to my unit, how dare you come up here. How dare you come up here. I said you don't have permission to come up to my unit, leave, leave, stop taking photos of me, stop taking photos. And they wouldn't stop and they wouldn't leave.

As the alleged victim himself admitted, none of the men pressed the elevator button to leave after Paese demanded that they do so, nor did the property manager remove his arm that extended into Paese's foyer to keep

3

the elevator door open to her unit.

Paese then approached the open door of the elevator and continued demanding that the men leave. When they did not, Paese reached into the elevator and swatted the alleged victim's cell phone out of his hand, knocking it to the elevator's floor. At that point, the property manager removed his extended arm as a barrier to the elevator door closing and ended the encounter. This constituted the extent of any physical contact between Paese and the alleged victim during the entirety of the incident. The code inspector suffered no physical injuries in the incident.

Paese testified that her key fob provides her exclusive access to her unit. In addition, she testified that the key fob does not provide her with access to any other unit or foyer. As Paese explained, "it's only programmed for my side of the elevator, on my floor, that's it." Paese testified that she, therefore, considers her key fob "to be the key to open the door to [her] private residence."

An assistant property manager who was not involved in the incident testified for the State. She described the area into which the elevator opens at Paese's unit as a "foyer," which she considered "a limited common element." However, the assistant property manager did not provide any documents establishing the legal status of the foyer, and the State did not introduce any such documents into evidence.

Paese testified that nobody in the building has a right to access her foyer or the rest of her unit without her permission. Paese also described the foyer as "a little area" in her private unit for her exclusive use:

> Everyone in my stack with that particular style of condo, with the private elevators, everybody decorates their vestibules, put[s] shoes, furniture, plants, your own tile, you're responsible for the painting, the light fixture in there that's [sic] you pay for that electricity, all of it is custom to however you want to make it. . . . It's just a little area.

Contrary to Paese's testimony, the assistant property manager testified that "anyone in the building can access her foyer" with his or her key fob. The assistant property manager also testified that a secondary door was supposed to be in between the foyer and the rest of Paese's unit. However, the three men who accompanied the code enforcement officer at the time of the incident were aware that Paese's secondary door was missing because of ongoing planned renovations. Indeed, the reason they brought the code enforcement officer to Paese's unit was to document the missing

4

secondary door. Thus, the four men used a master key fob to override Paese's exclusive access and open the elevator door into Paese's unit knowing full well that it would provide them with unobstructed access to the interior of the unit, including the personal property of Paese and her family located not only in the foyer area, but also in the rest of her unit.[2]

Less than a week after the immunity hearing, but before the trial court ruled on Paese's motion to dismiss, defense counsel moved to reopen the proof for the purpose of presenting additional evidence showing that Paese's key fob provides elevator access to only her unit, as she testified, contrary to the assistant property manager's testimony that any resident's key fob can provide access to any unit's foyer in the building. The trial court denied defense counsel's motion without comment.

Subsequently, after deposing both the property manager and the assistant property manager, defense counsel sought reconsideration of the trial court's decision not to allow the requested reopening of the proof. In support of this motion, defense counsel presented the trial court with excerpts from the assistant property manager's deposition in which she recanted her testimony at the immunity hearing by admitting that she had no knowledge about what access a resident's key fob provided to any other unit or foyer in the building. Defense counsel also presented the trial court with excerpts from the property manager's deposition in which he admitted that Paese's key fob provides her exclusive elevator access to only her unit, and that no other resident's key fob can access Paese's unit or foyer.

Rather than formally reopen the proof, the trial court orally ruled at the hearing on Paese's reconsideration motion that it would consider the submitted deposition excerpts as part of the proof presented at the immunity hearing.

In its denial of the motion to dismiss, the trial court analyzed Paese's immunity claim as being based on an asserted right to use "deadly force" during the incident, rather than "non-deadly force" as she asserted in her motion. The trial court then concluded that deadly force could not be used by Paese because the code inspector "was not committing a forcible felony" during the encounter. However, Paese never asserted a right to use deadly

---

[2] Even if the secondary door had not been removed, Paese had the right to keep her secondary door open at any time without diminishing her expectation of privacy and her right to the quiet enjoyment of her property. *See Quiet Enjoyment, Black's Law Dictionary* (6th ed. 1990) (A property "tenant or grantee shall enjoy the possession and use of the premises in peace and without disturbance.").

force in support of her immunity claim, nor did the State present any proof that Paese ever used or threatened to use deadly force.

Thus, the trial court evaluated Paese's actions based on an inapplicable subsection of the SYG law—776.031(2)—rather than the applicable subsection—776.031(1)—when it concluded that the State proved by clear and convincing evidence that she was not entitled to immunity from prosecution. *Compare* § 776.031(1), Fla. Stat. (2020), *with* § 776.031(2), Fla. Stat. (2020).

Paese petitions here for a writ of prohibition asserting her entitlement to immunity from prosecution pursuant to the SYG law.

### *Analysis*

The standard of review applicable to our disposition of Paese's petition requires us to "defer to the trial court's findings of fact." *Burns v. State*, 361 So. 3d 372, 375 n.2 (Fla. 4th DCA 2023). However, we "review de novo the trial court's legal conclusions drawn from those facts." *Id.*

### Preservation and Presentation of Error

The dissent asserts that Paese failed to adequately preserve for appellate review or advance in support of her petition the argument upon which our grant of relief is based. We agree with the dissent that preservation of a claim of error for appellate review requires a criminal defendant to present to the trial court "the specific legal argument or ground to be argued on appeal." *Tillman v. State*, 471 So. 2d 32, 35 (Fla. 1985). However, "no magic words are needed." *Murray v. State*, 3 So. 3d 1108, 1117 (Fla. 2009). As this court has observed, an issue will be considered preserved for appellate review if "the articulated concern" voiced by counsel to the trial court is "sufficiently specific to inform the trial court of the alleged error." *Harden v. State*, 87 So. 3d 1243, 1245 (Fla. 4th DCA 2012).

While we recognize the "requirement of specific argument and briefing is one of the most important concepts of the appellate process," *D.H. v. Adept Cmty. Servs., Inc.*, 271 So. 3d 870, 888 (Fla. 2018) (Canady, J., dissenting), the case upon which the dissent relies in arguing that we are granting relief on an unargued ground provides that this most basic of appellate duties is discharged by counsel "prepar[ing] appellate briefs so as to acquaint the [appellate] [c]ourt with the material facts, the points of law involved, and the legal arguments supporting the positions of the

respective parties." *Polyglycoat Corp. v. Hirsch Distribs., Inc.,* 442 So. 2d 958, 960 (Fla. 4th DCA 1983).

Moreover, an appellate court is not required to wear blinders in addressing a properly preserved argument that lacks citation to legal authority. *See Williams v. State,* 414 So. 2d 509, 511-12 (Fla. 1982) (While "counsel did not specifically cite to the prohibition against ex post facto laws as the basis for his legal argument[,] . . . . [h]is articulated concern with whether the effective date of section 947.16(3) permitted the statute's application to petitioner's case was sufficiently specific" for appellate review.); *see also Harden,* 87 So. 3d at 1245 ("As a preliminary matter, we find that this issue was preserved. Notwithstanding the fact that defense counsel did not use the magic word 'propensity,' it is apparent that defense counsel's articulated concern was sufficiently specific" for appellate review despite defense counsel's failure to "specifically argue that the victim's testimony was 'evidence of other bad acts which served only to show propensity to commit crime.'" (citing *Conner v. State,* 987 So. 2d 130, 133 (Fla. 2d DCA 2008))).

Contrary to the dissent's assertion, Paese not only sufficiently articulated in her petition the argument upon which we grant relief, she also articulated that same argument in her motion to dismiss and memorandum of law filed in the trial court. She argued that the SYG law gave her the statutory right to use non-deadly force against the code inspector and three other men involved in the incident because they "were wrongfully interfering with her personal property [by] physically and visually intruding into her private condominium unit." She therefore adequately preserved for appellate review and advanced in support of her petition the legal argument upon which we determine this case. Despite Paese's argument, the dissent accuses the majority of departing from neutrality by reaching the very issue argued by her in this appeal. We have unquestionably determined this appeal in a neutral and detached manner with fidelity to the law.[3]

---

[3] The dissent also incorrectly asserts that we have improperly used the tipsy coachman rule to grant relief. We have not. The tipsy coachman rule provides that "*if a trial court reaches the right result, but for the wrong reasons,* it will be upheld if there is any basis which would support the judgment in the record." *Dade Cnty. Sch. Bd. v. Radio Station WQBA,* 731 So. 2d 638, 644 (Fla. 1999) (emphasis added). We do not conclude that the trial court reached the "*right result.*" To the contrary, we conclude that the trial court reached the *wrong result* when it denied Paese immunity from criminal prosecution. Therefore, the tipsy coachman rule is immaterial to our determination of this case.

## The Justifiable Use of Non-Deadly Force

Florida grants a right to "[i]mmun[ity] from criminal prosecution and civil action for the [justifiable] use or threatened use of such force" permitted by sections 776.012, 776.013, or 776.031, Florida Statutes (2020), except in certain circumstances not applicable in this case. § 776.032(1), Fla. Stat. (2020).[4] As our supreme court explained in *Dennis v. State*, 51 So. 3d 456, 462 (Fla. 2010), "[s]ection 776.032(1) expressly grants defendants a substantive right to not be arrested, detained, charged, or prosecuted as a result of the use of legally justified force."

Whether a defendant was justified in using a particular level of force against another must be evaluated in accordance with "the objective, reasonable person standard." *Bouie v. State*, 292 So. 3d 471, 481 (Fla. 2d DCA 2020) (quoting *Montanez v. State*, 24 So. 3d 799, 803 (Fla. 2d DCA 2010)). Under that standard, the legal question to be resolved in all SYG cases is whether "a reasonable and prudent person in the same position as the defendant would believe" that the level of authorized force used was "necessary" to prevent the harm or offense for which such force is statutorily permitted. *Id.*; *see also Huckelby v. State*, 313 So. 3d 861, 866 (Fla. 2d DCA 2021) (applying the objective "reasonable and prudent person" standard to the use of non-deadly force pursuant to the plain language of the SYG law); *Garcia v. State*, 286 So. 3d 348, 351 (Fla. 2d DCA 2019) ("The trial court must determine whether, based on the circumstances as they appeared to the defendant, a reasonable and prudent person situated in the same circumstances and knowing what the defendant knew would have used the same force as did the defendant.").

Section 776.031(1) provides:

> *A person is justified in using or threatening to use force, except deadly force,* against another *when and to the extent that the person reasonably believes that such conduct is necessary to prevent or terminate* the other's trespass on, or *other tortious or criminal interference with,* either real property other than a dwelling or *personal property, lawfully in his or her possession*

---

[4] The immunity does not apply if "the person using or threatening to use force knew or reasonably should have known that the [victim] was a law enforcement officer." § 776.032(1), Fla. Stat. (2020). This exception does not apply here because the code inspector is not a law enforcement officer. *See* § 125.69(4)(f), Fla. Stat. (2020) ("Nothing in this subsection shall be construed to authorize any person designated as a code inspector to perform any function or duties of a law enforcement officer[.]").

*or in the possession of another who is a member of his or her immediate family or household* or of a person whose property he or she has a legal duty to protect. A person who uses or threatens to use force in accordance with this subsection does not have a duty to retreat before using or threatening to use such force.

§ 776.031(1), Fla. Stat. (2020) (emphasis added).

This court recently held that section 776.031(1)'s plain language authorizes the use of non-deadly force to prevent or terminate the tortious or criminal interference with one's personal property. *See Burns*, 361 So. 3d at 377 (holding that the defendant was justified in using non-deadly force to prevent or terminate "the reasonably perceived tortious and criminal interference with his dogs, which are his personal property").

Here, it is undisputed that Paese did not consent to the property manager's use of a master key fob to gain elevator access to her unit's private landing and foyer for the purpose of allowing the code inspector to photograph the interior of her home.

Paese testified that the foyer was her exclusive property. The assistant property manager testified that the foyer was a "limited common element."

"Limited common elements" are statutorily defined as "*elements which are reserved for the use of a certain unit . . . to the exclusion of all other units,* as specified in the declaration." § 718.103(19), Fla. Stat. (2020) (emphasis added).

The State, despite having the burden to prove by clear and convincing evidence that Paese was not entitled to SYG immunity, never introduced into evidence the condominium's governing documents. Therefore, we cannot speculate as to how the foyer was legally described or identified in the condominium declaration or any other governing document. However, the statutory definition makes it abundantly clear that if the foyer was a "limited common element" it was "reserved" for Paese's exclusive use.

Moreover, because the foyer was "reserved" for Paese's exclusive use, she had the right to keep her secondary door open at any time. Therefore, Paese would have had an expectation of privacy and the right to the quiet enjoyment of her property regardless of whether the secondary door was open or removed because an open secondary door is no different than a removed secondary door.

In addition, a condominium "*unit owner is entitled to the exclusive possession* of his or her unit, subject [only] to the provisions of s. 718.111(5)." § 718.106(3), Fla. Stat. (2020) (emphasis added).

While section 718.111(5) does provide a condominium association with an "irrevocable right of access to each unit," the statute specifies that such access is only available "*during reasonable hours, when necessary* for the maintenance, repair, or replacement of any common elements . . . *or as necessary* to prevent damage to the common elements or to a unit." § 718.111(5)(a), Fla. Stat. (2020) (emphasis added). Here, the State did not present any evidence that the association needed to enter Paese's unit "for the maintenance, repair, or replacement" of anything in its common elements. The State also did not present any evidence of any emergency necessitating immediate entry into Paese's unit "to prevent damage" to the common elements or another unit.

The association therefore could not legally access Paese's unit without either her consent or proper notice to enter at "reasonable hours." In fact, absent an emergency, a condominium association cannot even access an abandoned unit without written notice of no less than "2 days" to the owner of record for that unit. *See* § 718.111(5)(b)2., Fla. Stat. (2020) ("Except in the case of an emergency, *an association may not enter an abandoned unit until 2 days after notice of the association's intent to enter the unit has been mailed or hand-delivered to the owner* at the address of the owner as reflected in the records of the association." (emphasis added)).

The dissent asserts that the State had met its burden of establishing the property manager's legal authority to access Paese's private entry to her unit. However, the record is devoid of evidence establishing the property manager's authority to intrude on Paese's privacy by overriding her exclusive access without proper notice or legal process.

The record is also devoid of any evidence establishing that the code inspector had any independent legal authority to access Paese's private unit to take pictures of its interior without her consent or appropriate legal process.

Although the four men were legally entitled to be inside the elevator itself, they were not legally entitled to use a master key fob to override Paese's exclusive access to her private home, nor were they legally entitled to hold the elevator door open so that the code inspector could continue to intrude on her privacy by taking photographs of its interior, including the personal property in her home. Thus, the dissent's assertion that the code

inspector was present with the property manager's permission is irrelevant. If the property manager was not legally entitled to override Paese's exclusive access to her unit without proper notice or legal process, then the code inspector could not do so either.

One who "physically *or electronically* intrud[es] into [another's] private quarters" can be held liable for the tort of invasion of privacy in Florida. *Agency for Health Care Admin. v. Associated Indus. of Fla., Inc.*, 678 So. 2d 1239, 1252 n.20 (Fla. 1996) (emphasis added). This tort was first recognized in Florida in *Cason v. Baskin*, 20 So. 2d 243, 250 (Fla. 1944) (en banc). As our supreme court explained in *Allstate Insurance Co. v. Ginsberg*, 863 So. 2d 156, 162 (Fla. 2003), this tort provides a civil remedy for the wrongful intrusion "into a 'place' in which there is a reasonable expectation of privacy and is not referring to a body part."

There can be no doubt that "the highest reasonable expectation of privacy" a person can have is "when he [or she] is in his [or her] home for it is [the] sanctuary of privacy[.]" *Sarmiento v. State*, 371 So. 2d 1047, 1050 (Fla. 3d DCA 1979), *approved*, 397 So. 2d 643, 645 (Fla. 1981). This is particularly true here where the four men unexpectedly breached Paese's "sanctuary of privacy" by opening the private entry to her home to peer inside, inspect her property, and photograph her belongings without proper notice or legal process.

In *Rawls v. Conde Nast Publ'ns, Inc.*, 446 F.2d 313 (5th Cir. 1971), the Fifth Circuit Court of Appeals, which had federal court jurisdiction over Florida prior to the 1981 creation of the Eleventh Circuit, recognized "Florida's cause of action for the tortious invasion of privacy" in a diversity jurisdiction case applying Florida law where an alleged tortfeasor intrusively took unwelcomed pictures of the interior of plaintiff's home and her possessions. *Id.* at 316-18. *Rawls* explained that "it is not necessary to name or picture the plaintiff" to be actionable upon publication "if sufficient identification [of the plaintiff as the owner of the possessions] is otherwise made." *Id.* at 318 (quoting Arthur B. Hanson, *Libel and Related Torts* 204 (1969)). In other words, Florida recognizes a cause of action for the tortious invasion of privacy against a tortfeasor who improperly accesses a private home and photographs the possessions inside the home, if its owner, whose privacy was violated, is otherwise identified. *Id.*

Because section 776.031(1) permits the proportionate use of non-deadly force "to *prevent or* terminate" the "tortious or criminal interference" with "personal property," Paese was justified in using such force to simply *prevent* the tortious conduct even before any publication of the identifying pictures. § 776.031(1), Fla. Stat. (2020) (emphasis added).

11

Thus, we conclude that, pursuant to section 776.031(1), it was objectively reasonable for Paese to perceive the four men's unauthorized use of a master key fob to override her exclusive access and intrude upon her private home while taking unwelcomed photographs of its interior, including the personal property in her home, as the tortious interference with her personal property that she could justifiably prevent or terminate with the proportionate use of non-deadly force—i.e., by throwing the roll of duct tape towards the open elevator and swatting the cell phone out of the alleged victim's hand.  *See Burns*, 361 So. 3d at 377-78 n.5 ("Notably, the plain language of section 776.031(1) would not have prohibited Burns from using non-deadly force before the tree-cutting crew became trespassers as the statute allows the use of non-deadly force when a person 'reasonably believes that such conduct is necessary to *prevent or* terminate the other's trespass on, *or other tortious or criminal interference with, either* real property other than a dwelling *or personal property.*'" (quoting § 776.031(1), Fla. Stat. (2020))).

Moreover, because Paese was justified in using non-deadly force to protect her personal property as alternatively permitted by section 776.031(1), it is immaterial whether the men had trespassed upon the non-dwelling portion of her unit at the time of the encounter.  *See Sparkman v. McClure*, 498 So. 2d 892, 895 (Fla. 1986) (explaining that when the Legislature uses the word "or" in a statute it is to be interpreted in the disjunctive indicating "that alternatives were intended").[5]

### The Dissent's Mischaracterization of the Common Law

The dissent mischaracterizes the common law in asserting that we have engaged in a "result-oriented exercise of jurisprudence."  To justify this assertion, the dissent incorrectly borrows a common law term applicable only to defense of person cases—"physical harm"—to argue that our interpretation represents a "sea change" from "600 years of the common law" despite its absence as a prerequisite for the justifiable use of non-deadly force in either the SYG statute we are interpreting here—section 776.031(1)—or in the common law privilege to defend one's property or chattels.

---

[5] Paese also argued that she was justified in using non-deadly force pursuant to section 776.031(1) "to prevent or terminate" the "trespass" upon the private entry to her foyer which she considers her curtilage or an exclusive interest in "real property other than a dwelling."  We do not reach this issue in view of the alternative justification for use of non-deadly force permitted by the statute.

12

Our interpretation of the SYG statute is not a "sea change" from the common law. Rather, our interpretation is consistent with the common law. Indeed, the common law recognized a "privilege to use reasonable force, not intended or likely to cause death or serious bodily harm, *to prevent or terminate another's intrusion upon* the actor's land or *chattels*[.]" Restatement (Second) of Torts § 77 (Am. L. Inst. 1965) (emphasis added); *see also DPP v. Bayer* (2004) 1 Cr. App. R. 38 (QB) [498] (appeal taken from Eng.) ("It is a principle of the common law that a person may use a proportionate degree of force to defend . . . his property or the property of others[.]" (first citing *Hale, Pleas of the Crown*, Vol.1 Ch.8; then citing *Blackstone, Laws of England*, Book 3, Ch.1; then citing *Stephen, Digest of the Criminal Law*, Art.306; then citing *Hanway v. Boultbee* (1830) 1 Moo and Rob 15; and then citing *R v. Rose* (1847) 2 Cox C.C. 329)).

"[T]he Restatement of Torts as a whole reflects . . . [the] *spirit of our common law*[.]" Restatement (Second) of Torts Intro. (emphasis added) (quoting William Draper Lewis, Director, Am. L. Inst.); *see also Restatement of the Law*, Legal Info. Inst., https://www.law.cornell.edu/wex/restatement_of_the_law (last visited Dec. 13, 2023) ("The ALI [American Law Institute] created Restatements to help courts understand and interpret the *current common law*." (emphasis added)). In fact, the Restatements consist of "the fruit of the labor of the best legal minds in the diverse fields of law" reported in a "series of volumes authored by the American Law Institute" restating the common law. *Restatement of Law, Black's Law Dictionary* (6th ed. 1990).

In its entirety, section 77 of the Restatement (Second) of Torts describes the common law privilege to defend one's property or chattels as follows:

> *An actor is privileged to use reasonable force, not intended or likely to cause death or serious bodily harm, to prevent or terminate another's intrusion upon* the actor's land or *chattels,* if[:]
>
> (a) the intrusion is not privileged or the other intentionally or negligently causes the actor to believe that it is not privileged, and
>
> (b) the actor reasonably believes that the intrusion can be prevented or terminated only by the force used, and
>
> (c) the actor has first requested the other to desist and the other has disregarded the request, or the actor reasonably believes that a request will be useless or that substantial harm will be done before it can be made.

Restatement (Second) of Torts § 77 (emphasis added); *see also* W. Page Keeton et al*., Prosser and Keeton on Torts,* § 21 (5th ed. 1984) (citing Restatement (Second) of Torts § 77) (generally discussing the common law right to use non-deadly force in defense of chattels).

The dissent cites to section 217 of the Restatement to assert that the Restatement, albeit in another section, defines "intermeddling" as "physical contact." *See* Restatement (Second) of Torts § 217 ("Ways of Committing Trespass to Chattel"). However, that section applies only to a trespass. By definition, a trespass requires actual or implied "physical contact" with land or chattel. *See Trespass, Black's Law Dictionary* (4th ed. 1968) ("An unlawful act *committed with violence, actual or implied,* causing injury to the person, property, or relative rights of another; an injury or misfeasance to the person, property, or rights of another, *done with force and violence, either actual or implied in law.*" (emphasis added)).

The section upon which we rely—section 77—is the section applicable to the common law privilege to use non-deadly force to prevent or terminate the tortious interference with one's chattels. Section 77 neither uses the term "intermeddling," nor does it require an act of "physical contact" before one could invoke the privilege to use non-deadly force to prevent or terminate the tortious interference with one's chattels.

The privilege to use non-deadly force to prevent or terminate interference with one's personal property or chattels was therefore distinctly recognized at common law. Contrary to the dissent's assertion, the common law as described in section 77 does not condition the right to forcefully prevent or terminate interference with a person's personal property or chattels upon any "physical contact" or threat of "physical harm."

In addition, Paese's actions were consistent with both her statutory right to immunity from prosecution for her justifiable use of non-deadly force and her common law right to use such force to prevent or terminate the interference with her personal property or chattels. It was only after the four men disregarded Paese's multiple verbal requests to desist from tortiously interfering with her personal property, and depart from the private entry to her home, that she used a proportionate amount of force to reasonably prevent or terminate their unprivileged actions.

The dissent argues that our Legislature cannot change the common law—as the dissent asserts it did in section 776.031(1) by establishing immunity from prosecution, eliminating any duty to retreat, and clarifying the circumstances upon which the immunity could be invoked in defense

of personal property—without "expressly" stating so. However, the presumption that a statute replaces the common law only when it "expressly" says so applies only when the statute "*abolish[es]* common law rights[.]" *St. Angelo v. Healthcare and Ret. Corp. of Am.*, 824 So. 2d 997, 999 (Fla. 4th DCA 2002) (emphasis added) (quoting *Courtney Enters., Inc. v. Publix Super Mkts., Inc.,* 788 So. 2d 1045, 1049 (Fla. 2d DCA 2001)).

The dissent's argument incorrectly assumes that our Legislature has abolished a common law right. But the SYG statute we are interpreting here does not abolish any common law right. Instead, the statute simply augments and clarifies, without diminishing, the right to use reasonable non-deadly force to "prevent or terminate" interference with a person's personal property or chattels. *See* § 2.01, Fla. Stat. (2020) ("The common and statute laws of England . . . are declared to be of force in this state; *provided, the said* statutes and *common law be not inconsistent with* the Constitution and laws of the United States and *the acts of the legislature of this state*." (emphasis added)); *see also* Michelle Jaffe, *Up in Arms over Florida's New "Stand Your Ground" Law*, 154 Nova L. Rev. 155, 175 (2005) ("Although it appeared the judiciary had finally settled Florida's [common law] duty to retreat and 'castle doctrine' laws, on October 1, 2005, its decisions became obsolete, because on that day, Florida's new 'Stand Your Ground' law went into effect.").

Moreover, section 776.031(1) does not include any requirement of a threat of "physical harm" before a person is justified in using or threatening to use non-deadly force in defense of personal property. In fact, section 776.031(1) does not mention any threat of "physical harm." Instead, section 776.031(1) expressly provides that a person is justified in using non-deadly force "when and to the extent that the person *reasonably believes* that such conduct is *necessary to prevent or terminate*" another's "*tortious or criminal interference with . . . personal property*[.]" § 776.031(1), Fla. Stat. (2020) (emphasis added).

In contrast, while not including the term "physical harm," each of the other inapplicable sections in the SYG statutory scheme that authorize the use of non-deadly force—sections 776.012(1) and 776.013(1)(a)—seem to require some threat of "physical harm" because they require another's "imminent use of unlawful force"—which by implication may cause "physical harm"—before the defensive use or threat of non-deadly force is justified. *See generally* §§ 776.012(1), 776.013(1)(a), Fla. Stat. (2020).

Unlike sections 776.012(1) and 776.013(1)(a), section 776.031(1) does not contain any language requiring the "imminent use of unlawful force" by another as a prerequisite to the justifiable use or threatened use of non-

deadly force "to prevent or terminate" the "tortious or criminal interference with" a person's personal property. *Compare* § 776.012(1), Fla. Stat. (2020), *and* § 776.013(1)(a), Fla. Stat. (2020), *with* § 776.031(1), Fla. Stat. (2020).

In interpreting a statute, we must presume that a legislative body "acts intentionally and purposefully" when it "includes particular language in one section of a statute but omits it in another section." *Beach v. Great W. Bank*, 692 So. 2d 146, 152 (Fla. 1997) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). When the Legislature has used a term in one section of a statute but has omitted it from another section, we "will not imply it where it has been excluded." *Leisure Resorts, Inc. v. Frank J. Rooney, Inc.*, 654 So. 2d 911, 914 (Fla. 1995).

Furthermore, if a statute's language is clear, "courts have no occasion to resort to rules of construction—they must read the statute as written, for to do otherwise would constitute an abrogation of legislative power." *Nicoll v. Baker*, 668 So. 2d 989, 990-91 (Fla. 1996). Nevertheless, we note that even if we were to resort to the canons of statutory construction, they too would support our interpretation of section 776.031(1). *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 93, 107, 174 (2012) (discussing the omitted-case canon, in which a matter that is not covered in a statute is deemed to have been intentionally omitted; the negative-implication canon, in which the listing of some things implies the deliberate exclusion of others; and the surplusage canon, in which every word is given effect and none is deemed meaningless).

Because the Legislature chose to enact section 776.031(1)—justifying a person's use of non-deadly force "to prevent or terminate" the "tortious or criminal interference with" a person's personal property—without any prerequisite of either a threat of "physical harm" or "unlawful force"—we are required to give section 776.031(1) its plain and ordinary meaning. We have done so here.

### *Conclusion*

The trial court erroneously concluded that the State proved by clear and convincing evidence that Paese was not legally entitled to immunity from prosecution when she used non-deadly force to prevent or terminate the tortious interference with her personal property after the four men used a master key fob, without authority, to override her exclusive access and intrude upon her private home while taking unwelcomed pictures of its interior, including the personal property inside her home.

16

We emphasize that the force used by Paese was proportionate to her right, pursuant to section 776.031(1), to "prevent or terminate" the "tortious or criminal interference" with her "personal property." Had she employed force that was not reasonably tailored to simply prevent or terminate the tortious conduct, the disproportionate force would not have been justified.

It was only after the four men in the elevator disregarded Paese's multiple verbal requests to desist from tortiously interfering with her personal property, and depart from the private entry to her home, that she used a proportionate amount of force to prevent or terminate their unprivileged actions.

We therefore issue the writ of prohibition directing the trial court to grant Paese's motion to dismiss, thereby discharging her from further criminal prosecution on the felony battery charge.

*Petition for writ of prohibition granted; case remanded with instructions.*

FORST, J., concurs.

FORST, J., concurs specially with opinion.
GROSS, J., dissents with opinion.

FORST, J., concurring specially.

I concur in the majority opinion's application of section 776.031(1), Florida Statutes (2020), to the facts of this case.

Petitioner Paese told the property manager not to come up to her unit. *The property manager did not respond that he was coming up nonetheless, nor did he explain the exigency of, or the authority for, his visit.* The property manager then used the master key fob to open the elevator door and, without invitation, notice, announcement, explanation, or exigency, the privacy of Paese's residence and the personal property therein was breached. At no point during the period when the elevator door was open did the property manager or any of the other individuals in the elevator identify the purported victim as a code enforcement officer or otherwise explain the authority for their intrusion.

Did Paese use force once the elevator door opened to her unit? No. She clearly expressed her surprise and unhappiness with this violation of her privacy and her condo owner rights. In a similar situation, Paese may

17

have endeavored to shut the door to her unit.  That option wasn't available here due to the intrusion coming from an elevator rather than a hallway.

Nonetheless, Paese clearly conveyed her desire that the property manager and the three[6] other individuals in the elevator shut the elevator door and leave.  They did not, and one individual even used his arm to keep the door open while the purported victim held his cell phone in a manner that a reasonable person would believe was being used to capture photo or video images of the interior of Paese's residence and the personal property therein.

As the tortious interference was ongoing with no explanation *and no end in sight*, Paese took two actions that are the basis for the charges against her: she threw a roll of duct tape into the elevator, and she "struck" the phone from the purported victim's hand.

> An objective standard applies in evaluating the facts presented in a Stand Your Ground motion to dismiss.  The trial court must determine whether, based on the circumstances *as they appeared to the defendant,* a reasonable and prudent person situated in the same circumstances and knowing what the defendant knew would have used the same force as did the defendant.

*Garcia v. State*, 286 So. 3d 348, 351 (Fla. 2d DCA 2019) (internal citations omitted) (emphasis added).

Here, Paese used a minimal level of force, with no indication of an intent to cause pain or harm.  She did not swing a bat or any other object, nor did she punch or bite or kick anybody.  There is no claim that she threw the duct tape with the intent or ability to harm anybody (the defendant is named Paese, not Nolan Ryan or Sandy Koufax), or that her striking the hand of the individual taking photos/video had the force of a karate practitioner (it is undisputed that no injury was sustained by the purported victim).  **This minimal force employed here was proportionate and reasonable *under the circumstances* and the reversal opinion should not be read as justification for anything else.** Thus, neither the dissent nor anyone else need "shudder to think about the situations to which the majority opinion will be applied in the future," nor cause to question the majority's "neutrality" or objectivity.  *See Acad.*

---

[6] I am not aware as to the rationale for two of the four individuals being included on this expedition.

*for Positive Learning, Inc. v. Sch. Bd. of Palm Beach Cnty.*, 315 So. 3d 675, 689 (Fla. 4th DCA 2021) (Forst, J., concurring).

Gʀᴏss, J., dissenting.

The majority opinion departs from hundreds of years of settled law and expands the reach of Stand Your Ground statutes to situations involving no threat of physical harm to persons and no "trespass, or other tortious or criminal interference with, either real property *other than a dwelling* or personal property[.]" § 776.031(1), Fla. Stat. (2020) (emphasis added).

The majority opinion mischaracterizes the facts and misapplies the law.

First, the elevator itself was not part of the defendant's condominium unit and was not in the defendant's possession, but rather was a common element for which the defendant did not have exclusive access.

Second, the four men did not gain entry or access to the defendant's condominium unit itself, nor did the defendant have a reasonable belief that they were attempting to do so.

Third, the record does not support the majority's contention that the property manager was "not legally entitled" to use the master key fob to take the elevator to the defendant's floor, or to hold the elevator door open while the men remained in the elevator.

Fourth, the majority essentially ignores that the right to prevent interference with real property under section 776.031(1) is limited to real property "other than a dwelling."

Lastly, contrary to the majority's conclusion, the victim's conduct of photographing the interior of the defendant's home from the common element elevator was not a "tortious or criminal interference" with the defendant's personal property.

This is not a case where brigands were at the door of hearth and home, bent on pillage and plunder. A condominium association's property manager and city code inspectors were documenting a code violation in a condominium common area.

In this case, a picture is worth more than a thousand words. This was how the situation appeared at the moment when the defendant used the force that is the subject of her stand your ground motion:



As the trial judge wrote, the material "facts are not in dispute." The incident was captured on video, which is a part of the record. The video clearly shows that the victim, a code inspector, remained in the elevator throughout the incident and never trespassed or attempted to trespass into the defendant's condominium unit. The victim presented no threat to the defendant or her property that would permit the justifiable use of force.

The judge correctly found that there was "no trespass." After a hearing, the trial judge wrote that the defendant

> was in her home located in L'Hermitage condominium . . . Defendant received a call from the Property Manager asking if he, the property manager, and a Code Enforcement Officer . . . hereinafter "Victim" could come to her unit to look at the entrance foyer. Defendant told the Property Manager[] that she was not home, although she was present in the home, and not to come to her unit. The Property Manager, two Code Enforcement Officers (including the Victim), and a security guard from the condominium got into the elevator and stopped at the 18th Floor in the condominium. The doors to the elevator opened, the Property Manager, security officer and the Code Enforcement Officers stayed inside the elevator and took pictures of the area outside of the elevator. The Defendant yelled at the occupants of the elevator and threw a roll of duct tape at the occupants of the elevator and with her hand struck the hand of the Victim, knocking his phone out of his hand.
> . . .

20

Each of the State's witnesses reiterated that no one left the elevator and no one approached the Defendant in any manner. There was no trespass, there were no laws being broken by the "Victim." The "Victim" in this case was not committing a forcible felony, he was not engaged in a criminal activity, and he was in a place that he had a right to be in.

The judge also accepted the proof that the elevator was a common element of the condominium, as are most elevators in condominiums throughout South Florida. The assistant property manager testified that the "foyer" area outside the elevator and before the fire doors was a limited common element for the resident's use but belonging to the association. "Limited common elements" are "common elements which are reserved for the use of a certain unit or units to the exclusion of all other units, as specified in the declaration." § 718.103(19), Fla. Stat. (2020). Thus, a "limited common element" is still a type of "common element." "Common elements," in turn, are defined as "the portions of the condominium property not included in the units." § 718.103(8), Fla. Stat. (2020).

To these facts, I would add that the code enforcement officers were investigating whether the defendant's removal of the fire doors at the entrance to her unit was a code violation. The defendant's removal of the doors made the interior of her unit visible from the elevator. She was upset about the result of her own conduct, which the code enforcement officers were investigating. Her justification for using force was to prevent the code enforcement officer from taking pictures of the missing doors.

### *The Material Facts Reveal No Basis for Stand Your Ground Immunity*

The conduct of one seeking immunity from prosecution must fall within one of the statutory sections granting immunity. Here, it is obvious that section 776.012(1) does not apply because the defendant did not face the "imminent use of unlawful force." § 776.012(1), Fla. Stat. (2020).[7] Nor does section 776.013 apply, because the material facts did not demonstrate that the defendant could "reasonably believe[] that [her] conduct [was] necessary to defend" herself against anyone's "imminent use of unlawful force." § 776.013(1)(a), Fla. Stat. (2020).

---

[7] Section 776.012(2) is also inapplicable because the defendant did not use deadly force, nor was she facing the prospect of "imminent death or great bodily harm" or the "imminent commission of a forcible felony."

This leaves section 776.031(1), upon which the majority relies. By its terms, the statute does not apply to a person's defense of her dwelling. As it applies to this case, the statute allows a person to use force

> against another when and to the extent that the person reasonably believes that such conduct is necessary to prevent or terminate the other's trespass on, or other tortious or criminal interference with, either real property *other than a dwelling* or personal property, lawfully in . . . her possession . . . .

§ 776.031(1), Fla. Stat. (2020) (emphasis supplied).

Here, the elevator—where the victim remained for the entire incident—was not "real property other than a dwelling . . . , lawfully in [the defendant's] possession." Thus, because her condominium unit was her dwelling,[8] the statute comes into play only if the defendant's conduct was necessary to prevent the victim's "trespass on, or other tortious or criminal interference with . . . personal property." *Id.*

Prosser and Keeton identify two torts that apply to personal property, trespass to chattels and conversion. W. Page Keeton et al.*, Prosser and Keeton on Torts* (5th ed. 1984). "A trespass to a chattel may be committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another." Restatement (Second) of Torts § 217 (1965). "'Intermeddling' means intentionally bringing about a *physical contact* with the chattel." *Id.* at cmt. e (emphasis added). And conversion means "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." Restatement (Second) of Torts § 222A (1965).

There are various criminal statutes that protect personal property. *See, e.g.*, § 810.08, Fla. Stat. (2020) (prohibiting trespass in a structure or conveyance); § 812.014, Fla. Stat. (2020) (prohibiting theft). But none of these apply to the facts found by the trial judge, because none of the elevator's occupants made any move to leave it—the victim was using a camera to photograph a potential code violation from a common area.

Objectively, the defendant could not have reasonably believed that any type of physical force was "necessary to prevent or terminate" *the victim's*

---

[8] The defendant does not argue in her petition that the foyer area outside the elevator was "real property *other than a dwelling*," lawfully in her possession.

"trespass on, or other tortious or criminal interference with, either real property *other than a dwelling* or personal property." § 776.031(1), Fla. Stat. (2020). Therefore, the immunity statute did not authorize the defendant to resort to force of any type.

Even though the trial judge erroneously cited to the deadly force statute in its order, this mere scrivener's error in the order is not grounds for granting extraordinary writ relief. The court understood that it was addressing the use of non-deadly force.

### The Majority Opinion Expands Section 776.031(1) Beyond its Common Law Origins

In a result-oriented exercise of jurisprudence, the majority opinion holds that the defendant was reasonably using non-deadly force to prevent or terminate the tortious interference with her property. This holding rests largely on the victim's conduct of taking photographs of the interior of the defendant's home, including the personal property.[9] The majority's analysis represents a sea change in the Chapter 776 statutory law and 600 years of the common law.

Like defenses to common law torts, Stand Your Ground statutes are directed at preventing actual offensive physical contact or actual physical trespass or interference with property, not electronic or visual invasions of privacy.

Recognized since about 1400, the privilege of self-defense "extends to the use of all reasonable force to prevent any threatened harmful or offensive bodily contact[.]" *Prosser and Keeton,* at § 19. For the defense to apply, a defendant must have at least a reasonable belief that a danger of physical harm exists. *Id.* This privilege developed in recognition of situations where defendants "acted to further an interest of such social importance that it is entitled to protection[.]" *Id.* at § 16.

"The privilege to defend the possession of property rests upon the same considerations of policy as that of self-defense." *Id.* at § 21. Defense of property "is the privilege to resist a trespass, by force which would otherwise amount to assault, battery or false imprisonment." *Id.*

Likewise, section 77 of the Second Restatement of Torts, relied upon by the majority, "states only the privilege to use force against another for the

---

[9] The majority's holding also rests on an inaccurate characterization of the facts, as explained in this dissent.

purpose of preventing or terminating the other's intrusion upon the actor's *possession* of land or chattels." Restatement (Second) of Torts § 77 cmt. a (1965) (emphasis added). This section is contained within Chapter 4, Topic 2, which is entitled: "Defense of Actor's Interest in His Exclusive Possession of Land and Chattels." In short, this section describes an actor's right to use force to protect his exclusive *possessory* interest in property. While force may be used to protect against even a "harmless intermeddling" with chattels, the Restatement defines "intermeddling" as *physical* contact.

The tort of invasion of privacy, when based on an electronic or visual invasion rather than a physical one, cannot fairly be categorized as a tortious interference with *property*. Rather, such a tort is a privacy tort intended to protect a person's interest in seclusion. Here, the victim's conduct of taking photographs of the defendant's personal property was not a tortious interference with her exclusive possession of the property.

The Stand Your Ground statutes in Chapter 776 are consistent with the common law's notion that physical violence is proper to oppose a risk of actual physical harm to persons and actual physical interference with property. The statutes authorize the use of force in defense of a person or home to resist the "imminent use of unlawful force." §§ 776.012(1), 776.013(1)(a), Fla. Stat. (2020).

Section 776.031, the statute upon which the majority opinion relies, authorizes the use of force that is "necessary to prevent or terminate the other's trespass on, or other tortious or criminal interference with, either real property other than a dwelling or personal property[.]" § 776.031(1), Fla. Stat. (2020).

But "a statute will not displace the common law unless the legislature expressly indicates an intention to do so." *Kitchen v. K–Mart Corp.*, 697 So. 2d 1200, 1207 (Fla. 1997). "Unless a statute unequivocally states that it changes the common law, or is so repugnant to the common law that the two cannot coexist, the statute will not be held to have changed the common law." *Thornber v. City of Fort Walton Beach*, 568 So. 2d 914, 918 (Fla. 1990) (citations omitted).[10]

---

[10] According to the majority, "the presumption that a statute only replaces the common law if it 'expressly' says so applies only when the statute *abolish[es]* common law rights[.]" The majority cites *St. Angelo v. Healthcare and Ret. Corp. of Am.*, 824 So. 2d 997, 999 (Fla. 4th DCA 2002), as authority for this proposition. But nowhere in *St. Angelo* did we say that the presumption of no change in the

Section 776.031 is consistent with the common law notions that force may be employed to resist the threat of force—actual physical intrusion on or physical interference with property, such as that occurring in trespass or conversion. The defendant has not cited any authority that would permit the use of force to prevent a code officer from documenting a violation plainly visible from a common area.

The determination of the circumstances when self-help is appropriate is a question of social policy best left to the legislature. Here, the majority has usurped the role of the legislature. I shudder to think about the situations to which the majority opinion will be applied in the future. The concurring opinion's attempt to limit the application of the majority opinion will prove to be ineffective. Good lawyers will always seek to expand that opinion to their clients' advantage.

### The Majority Opinion Has Not Deferred to the Trial Court's Factual Findings

The majority opinion contains facts and legal analysis which are red herrings immaterial to the issue before us. Most troubling is the majority's rewriting of the facts in the light most favorable to the defendant.

We review the trial court's legal rulings de novo. *Wonder*, 162 So. 3d at 62. But "[w]e defer to the circuit court's factual findings when supported by competent, substantial evidence." *Id.* at 61–62. Significantly, the trial court's decision is "clothed with a presumption of correctness and the [appellate] court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling." *Viera v. State*, 163 So. 3d 602, 604 (Fla. 3d DCA 2015) (quoting *Terry v. State*, 668 So. 2d 954, 958 (Fla. 1996)).

Here, the evidence supports the conclusion that the elevator and foyer areas were common elements that the property manager had a right to enter and inspect for safety and code compliance. The condominium association is the entity "responsible for the operation of common elements." § 718.103(2), Fla. Stat. (2020). The elevator and foyer were not part of the defendant's unit. *Nor did the property manager need to enter the unit to gain access to these areas.* While the evidence showed that the foyer was a limited common element reserved for the use of the defendant's

common law "applies only" when a statute abolishes common law rights. Nor does my analysis "assume[] that our Legislature has abolished a common law right."

unit "to the exclusion of *all other units*," it does not follow that the defendant had a right to exclude *the association* from entering the foyer *located outside the defendant's unit* for the purpose of carrying out its responsibility for the operation of this common element.

Indeed, the property manager had a master key fob providing access to the elevator and the foyer, *which were accessible without entering the defendant's home*. The victim was present with the property manager's permission and was not trespassing.[11]

### *The Majority Opinion Grants Relief on Unargued Grounds*

Finally, the majority opinion has granted relief based on an argument that was not sufficiently raised in the petition to this Court. In particular, the majority relies upon a novel theory of tortious interference that the defendant has not clearly advanced in this proceeding.

At bottom, the defendant alleges in her petition that the men were trespassing into the curtilage of her home when they "opened what serve[d] as the 'front door.'" The defendant asserts that she is immune from prosecution because she "stood her ground against the victim's unlawful entry into the curtilage of her private home," where he took "photographs of its occupants and interior spaces" after "she had explicitly denied consent." In describing the State's theory of the case, the defendant mentions in passing that the photographs included pictures of her personal property. The defendant suggests that the victim violated her reasonable expectation of privacy under the Fourth Amendment. And the defendant repeatedly emphasizes the "clear and convincing" standard of proof required of the State.

---

[11] Even assuming the foyer area was "real property other than a dwelling . . . , lawfully in [the defendant's] possession," the victim did not enter the foyer area, and thus did not commit any kind of trespass. The video clearly shows that the victim stayed within the boundaries of the elevator—the common element—and he was therefore never trespassing or attempting to trespass. Similarly, it does not appear from the video that the property manager's hand ever extended *beyond* the elevator door into the foyer area while he was holding the door open from inside the elevator. But even if it did, this is irrelevant for two reasons: (1) the property manager had a right to enter the foyer located outside the defendant's unit; and (2) this case concerns whether the defendant's use of force against *the victim*—not the property manager—was justified because she reasonably believed that such conduct was necessary to prevent or terminate *the victim's* "trespass, or other tortious or criminal interference with" her property. § 776.031(1), Fla. Stat. (2020).

But nowhere in her petition does she advance the amorphous theory of tortious interference the majority opinion uses to decide this case. Indeed, her petition does not squarely argue that she reasonably believed her use of force was necessary to prevent or terminate the victim's commission of the tort of invasion of privacy, which is the tort the majority hangs its hat on. The petition uses the word "tortious" only twice, and one of those instances occurs in a block quote of section 776.031(1).

To be sure, the defendant's petition contains a single sentence vaguely alleging that the State failed to prove by clear and convincing evidence that she "did not reasonably believe [her] conduct was necessary to prevent or terminate the trespass, or other tortious or criminal interference, by four men" who ignored her demands for them to leave and to stop taking pictures. But the specific argument she advances is that the four men "committed the crime of trespass into the curtilage" of her home "when they opened the elevator door with a master security key fob and visually searched her person and the interior of her home, taking photographs[.]" Although the petition slings around various Fourth Amendment concepts, the defendant's petition boils down to an argument that the open elevator became part of the curtilage of her home and that the State failed to refute her justification claim because she reasonably believed the men were trespassing, giving rise to a presumption that the men had the intent to commit an unlawful act involving force or violence.

In sum, apart from the defendant's argument regarding criminal trespass into the curtilage of her home, the defendant's petition has not sufficiently briefed the issue of how she reasonably believed the victim's conduct was a "tortious or criminal interference" with "*either real property other than a dwelling or personal property.*"

A conclusory assertion fails to sufficiently present an issue for appellate review. *Spanakos v. Hawk Sys., Inc.*, 362 So. 3d 226, 245 (Fla. 4th DCA 2023). "When points, positions, facts and supporting authorities are omitted from the brief, a court is entitled to believe that such are waived, abandoned, or deemed by counsel to be unworthy." *Polyglycoat Corp. v. Hirsch Distribs., Inc.*, 442 So. 2d 958, 960 (Fla. 4th DCA 1983). "Claims for which an appellant has not presented any argument, or for which he provides only conclusory argument, are insufficiently presented for review and are waived." *Hammond v. State*, 34 So. 3d 58, 59 (Fla. 4th DCA 2010).

It is not this court's role to rebrief the defendant's petition. "To take this step would require us to depart from our role as a neutral tribunal and to become an advocate by developing arguments that the [petitioner]—

27

for whatever reason—has chosen not to make." *Manatee Cnty. Sch. Bd. v. NationsRent, Inc.*, 989 So. 2d 23, 25 (Fla. 2d DCA 2008).

The majority opinion has improperly relied upon an alternative theory to *grant* relief. *See Advanced Chiropractic & Rehab. Ctr. Corp. v. United Auto Ins. Co.*, 103 So. 3d 866, 869 (Fla. 4th DCA 2012) ("The tipsy coachman doctrine does not permit a reviewing court to reverse on an . . . unargued basis."); *Polyglycoat*, 442 So. 2d at 960 ("This Court will not depart from its dispassionate role and become an advocate by second guessing counsel and advancing for him theories and defenses which counsel either intentionally or unintentionally has chosen not to mention."); *D.H. v. Adept Cmty. Servs., Inc.*, 271 So. 3d 870, 888 (Fla. 2018) (Canady, C.J., dissenting) ("This requirement of specific argument and briefing is one of the most important concepts of the appellate process. Indeed, it is not the role of the appellate court to act as standby counsel for the parties."). The majority has departed from neutrality by crafting an argument for a party in order to reach a desired result.

### *Conclusion*

Relying upon a tortious interference theory that was not adequately advanced to this Court, the majority opinion expands the Stand Your Ground statute in a manner unsupported by the statutory text and our common law tradition. I respectfully dissent and would deny the petition.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***